IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-113

No. 364A20

Filed 24 September 2021

IN THE MATTER OF: M.Y.P.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 19 March 2020 by Judge Elizabeth T. Trosch in District Court, Mecklenburg County. This matter was calendared for argument in the Supreme Court on 19 August 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Marc S. Gentile, Senior Associate County Attorney, for petitioner-appellee Mecklenburg County Department of Social Services, Youth and Family Services Division.*

*Amanda S. Hawkins for appellee Guardian ad Litem.*

*Benjamin J. Kull for respondent-appellant father.*

NEWBY, Chief Justice.

¶ 1   Respondent, the father of M.Y.P. (Max), appeals from the trial court's order terminating his parental rights.[1] After careful review, we affirm.

¶ 2   Max was born on 27 May 2016. His parents have a lengthy history with family court, with each parent seeking legal custody at different times.

---

[1] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

¶ 3 On 2 October 2018, the Mecklenburg County Department of Social Services, Youth and Family Services Division (YFS) received a referral regarding Max. A neighbor had observed Max, who was then two years old, alone and crying on the balcony of his apartment. The Charlotte-Mecklenburg Police Department went to the residence, and after knocking several times, entered the unlocked apartment, and found Max alone inside the home. The apartment had no furniture in it other than a pack-n-play. The police and YFS attempted to contact respondent but were unsuccessful.

¶ 4 Accordingly, on 3 October 2018, YFS filed a petition, which it later amended, alleging that Max was neglected and dependent and obtained nonsecure custody. Respondent did not reappear until he arrived at a hospital on 5 October 2018 seeking treatment. Max was placed with the maternal grandfather and his girlfriend following a nonsecure custody hearing held on 10 October 2018.

¶ 5 After a hearing on 4 February 2019, on 8 March 2019, the trial court entered an order adjudicating Max neglected and dependent pursuant to respondent's stipulations to allegations in the amended petition. At disposition, the trial court found that there had been no alleviation of the conditions which led to Max's removal from respondent's home, which included domestic violence, lack of stable housing, and mental health issues. The trial court specifically noted the history of domestic violence between respondent and Max's mother, as well as between them and other

partners, which the trial court labeled as "volatile and violent." Additionally, respondent had failed to provide the court with accurate information regarding his housing or work history. The trial court also found that respondent "seems to have an irrational view of the facts in this matter" and "[h]is view of the facts is not credible and may qualify as delusional." The trial court further found that respondent had one visit with Max, was difficult to contact, and had not made any effort to establish or confirm visitation since 24 October 2018. Conversely, the court noted that Max had been placed with his siblings with the maternal grandfather, the placement had been positive, and Max was thriving. The trial court ordered the primary permanent plan for Max as reunification with a secondary plan of adoption. Additionally, the trial court ordered that Max remain in his placement with the maternal grandfather and granted respondent supervised visitation.

On 7 June 2019, the trial court entered a review order in which it found that respondent had: (1) outstanding orders for his arrest; (2) not visited with Max on a consistent basis; and (3) not demonstrated his ability to provide for Max's basic needs. Additionally, the court noted that YFS no longer had valid contact information for respondent and last had contact with him on 21 March 2019. The trial court further found that respondent had "taken no meaningful steps within the last two months to ameliorate the removal conditions" and authorized YFS to file a petition to terminate

parental rights. The trial court also changed the primary permanent plan for Max to adoption and the secondary permanent plan to reunification.

¶ 7 The trial court held a permanency planning review hearing on 10 July 2019. In an order entered on 6 August 2019, the trial court found that respondent still had not engaged in any services nor alleviated the removal conditions. The trial court noted that respondent had only visited Max twice since 4 February 2019.

¶ 8 On 11 July 2019, YFS filed a motion in the cause to terminate respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) (neglect) and (3) (failure to pay for the cost of care). On 19 March 2020, the trial court entered an order determining that grounds existed to terminate respondent's parental rights pursuant to neglect. N.C.G.S. § 7B-1111(a)(1) (2019). The trial court further concluded it was in Max's best interests that respondent's parental rights be terminated. Accordingly, the trial court terminated respondent's parental rights.[2] Respondent appeals.

## I. Adjudication

¶ 9 Respondent first argues that the trial court erred by terminating his parental rights based on neglect. Specifically, respondent contests several findings of fact, asserts that those findings do not support the trial court's conclusions of law, and

---

[2] The trial court's order also terminated the parental rights of Max's mother, but she did not appeal.

argues that terminating his rights here would undermine the legislature's intent in promulgating the neglect ground for termination cases.

¶ 10 A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under section 7B-1111(a) of our General Statutes. N.C.G.S. § 7B-1109(f) (2019). We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253 (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019).

¶ 11 Here the trial court concluded that a ground existed to terminate respondent's parental rights based on N.C.G.S. § 7B-1111(a)(1) (neglect). A trial court may terminate parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) where it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1). A neglected juvenile is defined, in pertinent part, as a juvenile "whose parent . . . does not provide proper care, supervision, or discipline;

. . . or who lives in an environment injurious to the juvenile's welfare . . . ." N.C.G.S.

§ 7B-101(15) (2019). We have recently explained that

> "Termination of parental rights based upon this statutory
> ground requires a showing of neglect at the time of the
> termination hearing or, if the child has been separated
> from the parent for a long period of time, there must be a
> showing of . . . a likelihood of future neglect by the parent."
> "When determining whether such future neglect is likely,
> the district court must consider evidence of changed
> circumstances occurring between the period of past neglect
> and the time of the termination hearing."

*In re R.L.D.*, 375 N.C. 838, 841, 851 S.E.2d 17, 20 (2020) (first quoting *In re D.L.W.*,

368 N.C. 835, 843, 788 S.E.2d 162, 167 (2013), then quoting *In re Z.V.A.*, 373 N.C.

207, 212, 835 S.E.2d 425, 430 (2019)).

¶ 12      In support of its conclusion as to N.C.G.S. § 7B-1111(a)(1), the trial court made

the following findings of fact:

> 22. On October 2, 2018 at approximately 10:20 pm, YFS
> received a referral alleging that the juvenile had been left
> alone at his residence and had been in and out of the
> apartment residence crying for the Respondent Father.
>
> 23. Law enforcement had been called to the Respondent
> Father's residence approximately 40 minutes before YFS
> was called. When officers arrived, they knocked on the door
> several times, but no one answered. Because the child was
> so young, the doorknob was checked and it was unlocked so
> officers entered. The child was found alone and without any
> supervision. The only furniture in the residence was a
> pack-n-play. There was a letter addressed to the
> Respondent Father, but a different address was listed.
> Officers knocked on neighbors' doors but no one knew the
> Respondent Father. The telephone numbers that law

enforcement found for the Respondent Father were disconnected or were no longer in service so the juvenile was transported to a regional substation.

24. The juvenile was left alone without adult supervision since at least 8:00 pm on October 2, 2018. The Respondent Father was unavailable to provide any care or supervision until Friday, October 5, 2018. During the nonsecure custody hearing for this juvenile, the Respondent Father [sic] testimony was inconsistent and mostly incoherent. In sum, he claimed that [Max's mother] kidnapped him in the evening hours of October 2, 2018 and then held him hostage and assaulted him repeatedly until October 5, 2018 when he sought treatment at a local hospital. [Max's mother] has been charged criminally as a result of this allegation, but she has not been seen or heard from since October 5, 2018 and her charges remain pending.

25. As for the lack of furniture in the apartment where the juvenile was found, the Respondent Father and the juvenile had been living there for weeks. He claims that furniture was being delivered. He and [his wife] were married at this time, but he had not lived with her for at least three years though he still depended on her for support.

26. Prior to the filing of the juvenile petition, [respondent and Max] lived together in at least six different residences.

. . . .

28. [Max] was adjudicated neglected and dependent on February 4, 2019. [Respondent] was present during the adjudication. The dispositional hearing occurred immediately after the juvenile was adjudicated.

29. During disposition, the [c]ourt found that issues of mental illness, domestic violence, inadequate and unstable housing and substance abuse were all conditions that led to the aforesaid neglect adjudication. The Respondent

Father was awarded a minimum of biweekly supervised visitation.

30. Between the dispositional hearing and the First Review Hearing (on April 29, 2019), Respondent Father visited with the juvenile only twice and during a two-month stretch within this review period he contacted YFS only once. By this First Review Hearing, which he did not attend, he had not taken any steps to demonstrate that he was making any progress on alleviating any of the removal conditions. During this April hearing, this [c]ourt adopted the Respondent Father's case plan which called for him to be screened by the FIRST program which screens for needs in the areas of mental health, substance abuse, and domestic violence and to then comply with all recommendations, sign appropriate releases for any services, and to demonstrate that he can meet the basic needs of himself and the juvenile.

31. The [c]ourt conducted a Permanency Planning Hearing (PPH) on July 10, 2019 which the Respondent Father attended. Between the aforesaid April hearing and the PPH, Respondent Father did not have any visitation with the juvenile.

32. With respect to the Respondent Father's involvement with FIRST since the filing of the juvenile petition, he was initially referred there in January 2019. He completed paperwork at that time and submitted a urine sample that was positive for alcohol and marijuana. On or about July 21, 2019, he provided another marijuana-positive urine sample. The Respondent Father eventually submitted to the assessment on July 31, 2019. Needs were identified in the areas of substance abuse and domestic violence. Respondent Father was referred for a substance abuse assessment with Anuvia and for a domestic violence assessment with Community Support Services. On October 17, 2019, he provided a urine sample that was positive for cocaine and marijuana. A follow up appointment was requested after the October sample was received, but

Respondent Father never returned. Anuvia's assessment recommended that he complete a 40-hour outpatient program, but he never started the program.

33. Respondent Father claimed to the forensic evaluator . . . that he had only occasionally consumed alcohol since he moved back from California. For this same time frame, he claimed that he had not used any illegal drugs. He lived in California between August 2017 and February 2018. The drug screen results discussed above demonstrate his testimony in this regard was not accurate.

34. Overall, the Respondent Father has provided inconsistent information to the [c]ourt, the forensic evaluator, and YFS. Assessments of his emotional and behavioral functioning completed as part of the Personality Assessment Inventory were uninterpretable due to his scores on the validity scales. The pattern of responses suggested a significant level of defensiveness. His responses also reflected a considerable distortion and minimization of difficulties. It was this personality profile and behavioral approach to issues that has led to the Respondent Father's failure to acknowledge any problems that impact on his ability to provide adequate care and supervision to the juvenile or take any action to address his noted problems.

35. As of the date of this TPR proceeding, Respondent Father had not initiated any services to address issues related to substance abuse or domestic violence so he has made no progress in alleviating either condition. He maintained that he resides in the apartment where the juvenile was found unattended on October 2, 2019. He has never made that residence available for inspection to determine whether it is structurally safe or otherwise appropriate for the juvenile.

36. The Respondent Father testified with clarity and certainty about events and circumstances of the custody dispute with [Max's mother] (e.g. the procedural history of

the family court proceedings), his prior living arrangements, and his work history. However, he offered the effects of a traumatic brain injury to excuse or explain his absence from his son's life since he entered YFS nonsecure custody, his failure to consistently visit with the child during that same time, or otherwise to engage in services to alleviate the injurious conditions that led to YFS obtaining nonsecure custody.

. . . .

38. . . . . [Respondent] has had only sporadic contact with [Max] since [Max] entered YFS nonsecure custody. He has not engaged in or remedied any removal conditions and his residence has not been confirmed. He is unable to provide proper care and supervision within a reasonable period of time.

39. Due to [respondent's] failure . . . to engage in any services or to establish that [he] can provide proper care and supervision [of Max], YFS cannot recommend that [Max] be returned [to his care]. Consequently, multiple barriers to reunification are still present, [Max] remains in YFS nonsecure custody, and there is a high probability of the repetition of neglect.

¶ 13        We first consider respondent's challenges to findings of fact 25, 29, and 31. Respondent contends that in finding of fact 25, the following portions of the finding were unsupported by the evidence: that he had been living "for weeks" in the apartment where Max was found; that he "claimed that furniture was being delivered" for the apartment; and that he depended on his then wife for support. We agree. Accordingly, we disregard these portions of finding of fact 25. *See In re S.M.*,

375 N.C. 673, 684, 850 S.E.2d 292, 302 (2020) (disregarding findings of fact that are unsupported by clear, cogent, and convincing evidence).

¶ 14      Respondent next contends that finding of fact 29 incorrectly states that during disposition, the trial court found that substance abuse was one of the conditions which led to the adjudication of neglect. While the dispositional order states that respondent "seems to have a substance abuse history," respondent is correct that the trial court only explicitly listed "domestic violence," "stable housing," and "mental health" to be "the problems which led to adjudication and must be resolved to achieve reunification." Therefore, we disregard this portion of finding of fact 29 to the extent it was considered as a problem that led to adjudication. We note, however, that respondent does not challenge finding of fact 32, which states that respondent's assessment in July of 2019 identified needs "in the area[ ] of substance abuse." As such, the fact that respondent had a history of substance abuse is a proper consideration when determining whether the trial court properly terminated respondent's rights.

¶ 15      Respondent next argues that finding of fact 31 incorrectly states that he did not visit with Max between 29 April and 10 July 2019. We agree. A social worker testified that respondent visited Max on 7 June 2019. Therefore, we disregard this portion of the trial court's finding of fact since respondent had a visit with the child during this four-month period.

¶ 16      Regardless of our conclusion that the above findings of fact are unsupported, such error is harmless as the remaining findings in the trial court's order still support its conclusion that respondent's rights were subject to termination based on neglect. The trial court found that Max was adjudicated neglected on 4 February 2019. Notably, respondent stipulated to the findings of fact supporting the adjudication of neglect and did not appeal from the trial court's order. This Court has repeatedly stated that "[w]hen determining whether a child is neglected, the circumstances and conditions surrounding the child are what matters, not the fault or culpability of the parent." *In re Z.K.*, 375 N.C. 370, 373, 847 S.E.2d 746, 748–49 (2020); *see also In re S.D.,* 374 N.C. 67, 75, 839 S.E.2d 315, 322 (2020) ("[T]here is no requirement that the parent whose rights are subject to termination on the grounds of neglect be responsible for the prior adjudication of neglect."); *In re J.M.J.-J.*, 374 N.C. 553, 564, 843 S.E.2d 94, 104 (2020) (rejecting the respondent's argument "that the trial court's conclusion of neglect was erroneous because he was not responsible for the conditions that resulted in [his daughter's] placement in DSS custody"). Consequently, based upon its finding that there had been a prior adjudication of neglect, we conclude the trial court's findings were sufficient to support its conclusion that Max was previously neglected.[3]

---

[3] Respondent also challenges findings of fact 9–14, 17, and 19 as being unsupported by the evidence. These findings of fact concern events between October 2016 and October 2017. They detail respondent's relationship with Max's mother, claims of substance abuse by

¶ 17 Respondent next argues that the trial court's determination that there was a likelihood of future neglect was erroneously based on his failure to comply with his case plan. Respondent asserts that allowing termination under N.C.G.S. § 7B-1111(a)(1) based on a parent's non-compliance with his case plan would rob the parent of the important safeguards provided by N.C.G.S. § 7B-1111(a)(2), which would have afforded him a full twelve months to show improvement. Again, respondent's argument is unpersuasive.

¶ 18 This Court has stated that "[a] parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.A.*, 374 N.C. 865, 870, 844 S.E.2d 916, 921 (2020) (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637, 810 S.E.2d 370, 373 (2018)); *see also In re W.K.*, 376 N.C. 269, 278–79, 852 S.E.2d 83, 91 (2020) (noting that "[b]ased on respondent-father's failure to follow his case plan and the trial court's orders and his continued abuse of controlled substances, the trial court found that there was a likelihood the children would be neglected if they were returned to his care").

---

respondent and improper care and supervision of Max, various custody orders entered concerning Max, and a motion for contempt filed by respondent against Max's mother and her purging of contempt. We decline, however, to review these findings of fact. These findings of fact all concern events and allegations that were unrelated to and preceded the claims which led to the filing of the juvenile petition and the adjudication of Max as a neglected juvenile. Consequently, because they are not necessary to the trial court's determination that respondent previously neglected Max, we need not review them. *See In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58–59 ("[W]e review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." (citing *In re Moore*, 306 N.C. at 404, 293 S.E.2d at 133)).

¶ 19 Here the trial court's unchallenged findings of fact demonstrate that mental illness, domestic violence, and unstable housing were conditions the trial court identified which led to Max's removal from respondent's custody and the adjudication of neglect. To address these issues, the trial court adopted respondent's case plan, which required him to be screened for needs in these areas and to comply with all recommendations. Respondent submitted to the screening, which identified a need in the area of domestic violence. The trial court found, however, that respondent failed to initiate any services to address domestic violence and made no progress in ameliorating this issue. In addition to those findings regarding respondent's failure to address domestic violence concerns, the trial court found that, consistent with respondent's prior issues with unstable housing, YFS was unable to confirm respondent's residence.

¶ 20 Furthermore, though awarded visitation, respondent failed to consistently visit with Max. Additionally, the trial court's determination that there was a likelihood of future neglect did not rest solely on respondent's failure to complete his case plan. For example, substance abuse was also identified as an area of need for services, and the trial court could properly conclude that failure to address this issue could lead to a repetition of neglect. *See In re D.L.A.D.*, 375 N.C. 565, 572, 849 S.E.2d 811, 817 (2020) (stating that "a substance abuse problem that likely went untreated could inhibit a parent's capability or willingness to consistently provide adequate care

to a child" and thus would support a determination that neglect would likely repeat in the future). The trial court found that during the relevant periods of time during this proceeding, respondent twice tested positive for marijuana, tested positive once for cocaine, and failed to begin a recommended forty-hour outpatient substance abuse program. Thus, based on respondent's failures to address all of these issues, the trial court properly determined that there was a high probability of repetition of neglect should Max be returned to his father's care and custody.

¶ 21      Notably, though respondent disputes the trial court's assessment of his culpability, i.e., whether he was responsible for the neglect, it was within the trial court's authority to pass on respondent's credibility. Having interacted with respondent throughout the proceeding, the trial court was in the best position to determine respondent's credibility regarding his culpability as it relates to neglect. *See In re C.A.H.*, 375 N.C. 750, 759, 850 S.E.2d 921, 927 (2020) (noting that the trial court, given its unique position, is the proper entity to make credibility determinations and thus appellate courts should not reweigh such determinations). Therefore, the trial court's remaining findings of fact support its conclusion of law that a ground existed to terminate respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1). Accordingly, we affirm the trial court's determination that a ground existed to terminate respondent's parental rights based on neglect.

## II.     Disposition

¶ 22        We next consider respondent's arguments regarding disposition. If the trial court finds at least one ground to terminate parental rights under N.C.G.S. § 7B-1111(a), it proceeds to the dispositional stage where it must "determine whether terminating the parent's rights is in the juvenile's best interest" based on the following factors:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019).

¶ 23        Respondent contends the trial court committed reversible error when it prevented him from testifying about his concerns regarding Max being placed with the maternal grandfather. At the termination hearing, respondent began testifying that before Max was born, the following events occurred:

> [Max's mother] called me ranting and raving, saying that [the maternal grandfather] was yelling and being

belligerent. But when I was on the phone with him -- or with her, I guess he whipped out his penis and peed on the door. She told me to get over there. I left my apartment at --

DSS's attorney objected to respondent's testimony and the trial court sustained the objection, noting that the allegation about the maternal grandfather's suitability as a placement for Max had already been litigated and resolved.

Respondent asserts that the trial court's exclusion of his testimony was based on the doctrine of collateral estoppel. Respondent contends that the trial court misapplied the doctrine because there was no prior order in the case regarding the incident about which he sought to testify. Respondent argues that the exclusion of the testimony was prejudicial because it directly undermined its determination of Max's best interests. We are not persuaded.

Importantly, to preserve an argument concerning the exclusion of evidence, a party is required to make an offer of proof in accordance with N.C.G.S. § 8C-1, Rule 103(a)(2). *State v. Atkins*, 349 N.C. 62, 79, 505 S.E.2d 97, 108 (1998). This Court has stated:

> [W]e would hold that, whether an objection be to the admissibility of testimony or to the competency of a witness to give that, or any, testimony, the significance of the excluded evidence must be made to appear in the record if the matter is to be heard on review. Unless the significance of the evidence is obvious from the record, counsel offering the evidence must make a specific offer of what he expects to prove by the answer of the witness.

*Currence v. Hardin*, 296 N.C. 95, 99–100, 249 S.E.2d 387, 390 (1978). Here respondent failed to make an offer of proof regarding the excluded testimony and the substance of the excluded testimony regarding the maternal grandfather is not obvious from the record.

Furthermore, even assuming that this argument was preserved for appeal, we would decline to find that the trial court abused its discretion by curtailing respondent's testimony. N.C.G.S. § 7B-1110(a) provides that at the dispositional hearing, the trial court "*may* consider any evidence, including hearsay evidence as defined in G.S. 8C-1, Rule 801, that the court finds to be *relevant, reliable, and necessary* to determine the best interests of the juvenile." N.C.G.S. § 7B-1110(a) (emphases added). Additionally, this Court has stated that

> during the adjudication stage of a termination proceeding, the trial court must apply the provisions of the North Carolina Rules of Evidence that apply in all civil cases. During the dispositional stage, conversely, *the trial court retains significantly more discretion in its receipt of evidence and may admit any evidence that it considers to be relevant, reliable, and necessary* in its inquiry into the child's best interests[.]

*In re R.D.*, 376 N.C. 244, 250–51, 852 S.E.2d 117, 124 (2020) (emphasis added).

Notably, here the same trial judge who presided over the termination hearing had presided over Max's case since the filing of the initial petition in October 2018. Furthermore, though respondent's testimony was curtailed, some of his concerns regarding the maternal grandfather were described in his testimony. Importantly,

the trial court had previously heard the concerns regarding the maternal grandfather's fitness and determined they were without merit. Given the wide discretion afforded the trial court in making evidentiary rulings during the dispositional hearing, even assuming that the issue had been preserved for appellate review, we would conclude the trial court did not abuse its discretion by excluding further testimony from respondent on this issue. *See id.* at 253, 852 S.E.2d at 126 (stating that N.C.G.S. § 7B-1110 "gives the trial court broad discretion regarding the receipt of evidence in its quest to determine the best interests of the child under the particular circumstances of the case").

¶ 28    Respondent next argues that the trial court applied the wrong evidentiary standard when deciding whether it was in Max's best interests to terminate his parental rights. Specifically, respondent claims that the trial court applied the clear, cogent, and convincing evidentiary standard that is required for adjudicatory findings. Respondent argues that the failure to apply the correct standard was necessarily prejudicial.

¶ 29    At the adjudication stage, the burden "shall be upon the petitioner or movant and all findings of fact shall be based on clear, cogent, and convincing evidence[,]" N.C.G.S. § 7B-1109(f) (2019), whereas "no burden of proof should be imposed upon either party at the dispositional stage," *In re R.D.*, 376 N.C. at 256, 852 S.E.2d at 127. A trial court is not required to bifurcate the adjudicatory and dispositional hearing,

and the evidence from both stages may be intertwined. *See In re S.M.M.*, 374 N.C. 911, 915, 845 S.E.2d 8, 12 (2020) ("Although the dispositional evidence was intertwined with adjudicatory evidence, a trial court is not required to bifurcate the hearing into two distinct stages."). The trial court must still apply the correct standard of proof at each stage of the proceedings. *See In re R.B.B.,* 187 N.C. App. 639, 643–44, 654 S.E.2d 514, 518 (2007) (stating that a trial court may combine the adjudicatory and dispositional stages into one hearing so long as it applies the correct evidentiary standard to each stage), *disc. rev. denied,* 362 N.C. 235, 659 S.E.2d 738 (2008). Nevertheless, this Court has recognized that even an incorrect recitation of the standard of proof may not constitute reversible error where it is not prejudicial. *See In re L.E.W.*, 375 N.C. 124, 128, 846 S.E.2d 460, 465 (2020) (concluding that the trial court's incorrect statement that it applied a clear, cogent, and convincing evidentiary standard to review a permanency planning order worked in the respondent's favor as it required DSS to present stronger proof than actually required, thus rendering any error harmless); *see also In re A.J.A.-D.*, 269 N.C. App. 677, 837 S.E.2d 483 (2020) (noting that the trial court's improper designation of the "clear, cogent, and convincing" standard of proof to its dispositional findings was harmless error since it worked to benefit the respondent by requiring DSS to meet a higher burden than would normally apply).

Here with respondent's consent, the trial court consolidated the adjudicatory and dispositional hearings. In its written order, the trial court noted that it made its findings of fact by "clear, cogent, and convincing evidence." The trial court did not, however, state in open court or in its order that it recognized that there was no burden of proof applicable to the best interests determination at the dispositional stage.

Despite the trial court's failure to state the different evidentiary standards applied to each portion of the proceeding, the trial court noted that it determined that terminating respondent's rights was in the child's best interests. It did so after assessing each factor listed in N.C.G.S. § 7B-1110, finding that:

> 38. While [respondent] did appear to have a bond when he visited with [Max], it was not a particularly strong bond. . . .[4]
>
> . . . .
>
> 40. That the goal of the case is adoption.

---

[4] Respondent also challenges as being unsupported by clear, cogent, and convincing evidence the portion of finding 38 which stated that "[w]hile [respondent] did appear to have a bond when he visited with [Max], it was not a particularly strong bond." Notably, this finding of fact concerns the trial court's determination of the child's best interests under N.C.G.S. § 7B-1110(a) and was not necessary to the trial court's conclusion that a ground existed to terminate respondent's parental rights.

We review this argument as a challenge to one of the trial court's dispositional findings. Respondent notes that there was testimony in the record that respondent interacted appropriately with Max and that their visits were positive. Notably, this evidence that respondent cites does not concern the strength of the bond between respondent and Max. Importantly, the record contains evidence that the bond between respondent and Max could not be described as a parent/child bond due to, *inter alia*, the infrequency of respondent's visits and his general lack of effort. Thus, there is competent evidence in the record that supports the trial court's finding here.

> 41. [Max] resides with his maternal grandfather . . . . In that home, [Max's] two older siblings also reside along with [the maternal grandfather's] paramour . . . . That home is a loving, caring, stable, and potentially adoptive home. The likelihood of adoption is very high. Terminating [respondent's] parental rights will aid in the accomplishment of the permanent plan of adoption. [Max] cannot be adopted unless [respondent] consent[s] to an adoption or [his] parental rights are terminated. During observations of [Max] in [the maternal grandfather and his paramour's] residence, he appears happy and very attached to everyone who resides there. Terminating [respondent's] parental rights is in the child's best interest.

Therefore, it is clear that the trial court understood what it must consider when determining the best interests of the child. Moreover, even if the trial court applied the wrong evidentiary standard, respondent has not shown he was prejudiced by the trial court's failure to articulate the lower standard employed for the dispositional phase. Applying a "clear, cogent, and convincing" standard to the dispositional phase here meant that the trial court would have required YFS to overcome a heightened standard to show that terminating respondent's rights was in the child's best interests. *See In re L.E.W.*, 375 N.C. at 128, 846 S.E.2d at 465. Thus, respondent's argument is overruled.

As such, we affirm the trial court's order terminating respondent's parental rights.

AFFIRMED.